785 P.2d 625

Kathryn Anne WOLFORD, Plaintiff-Appellant, Cross Respondent-Appellant on appeal,

v.

David G. WOLFORD, Defendant-Respondent, Cross Appellant-Respondent on appeal.

No. 17423.

Supreme Court of Idaho.

Jan. 15, 1990.

Roark, Donovan, Praggastis, Rivers & Phillips, Hailey, for plaintiff-appellant, cross respondent-appellant on appeal. R. Keith Roark argued.

Hogue, Speck & Aanestad, Ketchum, for defendant-respondent, cross appellant-respondent on appeal. Douglas J. Aanestad argued.

BAKES, Chief Justice.

Plaintiff/appellant sued defendant/respondent, requesting a divorce and division of assets. The magistrate, J. William Hart, granted the divorce and divided the community assets, and awarded one-third of the value of defendant's major separate property asset, his stock in CommTek, Inc., to the community, finding

that one-third of CommTek's increase in value was due to community efforts. On appeal, the district court generally affirmed the magistrate's findings of fact and the divorce; however, it reversed the magistrate's award of one-third of the value of the husband's separate stock in CommTek to the community, ruling that under *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974), the community had already been adequately compensated for its effort. Plaintiff/appellant appeals from the district court's appellate decision. We affirm the district court's order.

I

The facts as found by the magistrate's court, and as affirmed by the district court in its appellate opinion, are as follows. Kathryn Anne Myers and David Wolford first met in June of 1977. They were subsequently married on October 15, 1978.

Two weeks prior to the marriage, David had his attorney prepare an ante-nuptial agreement which he presented to Kathryn. He also made arrangements for her to consult with Mr. George Kneeland, another attorney in the Wood River Valley. Kathryn met privately with Mr. Kneeland at his office in Ketchum, Idaho, and had every opportunity to discuss with him the nature of the document. She was advised by Mr. Kneeland of the exact consequences of the agreement, *i.e.*, that while the income from her salaries and personal earnings would remain her own separate property, together with any income or increase in the value of her own separate property, that David's "salaries and personal earnings" would be community property, but that any income or increase in his separate property, including any enhancement in the value of the separate property, would remain his separate property.[1] The ante-nuptial agree-

---

1. The portion of the ante-nuptial agreement dealing with the separate property of the parties states in part:

    3. *Separate Property.* Each party shall separately retain all rights and have complete control of his or her own separate property, whether now owned or hereafter acquired, and the rents, profits, and increase thereon,

and each party shall have the absolute and unrestricted right to enjoy, manage, dispose of or otherwise deal with such separate property and the rents, issues, and profits thereon, free from any claim that may be made by the other party by reason of their marriage, and with the same effect as if no marriage had been consummated between them. The fore-

ment listed in a schedule both David's and Kathryn's separate property, including the stock of CommTek, Inc., which was listed as David's separate property asset. The agreement was apparently signed in Mr. Kneeland's office, having been notarized by his office staff and having been signed in addition by Mr. Kneeland. There was no fraud, coercion, undue influence or over-reaching on the part of David in the presentation, negotiations or signing of the ante-nuptial agreement.

After a six-week honeymoon in Europe, and after a stay at the University of Hawaii, the parties returned to the Wood River Valley nine months later in the summer of 1979. With his extensive knowledge, experience and expertise in the electronics and television communications industry, David then conceived the idea of publishing a magazine that would provide scheduling service to TV cable operators and which was eventually marketed to satellite dish owners. Among other things, David traveled to the east coast in furtherance of the idea. The magazine became known as SAT–GUIDE.

Approximately one year after David and Kathryn were married, SAT–GUIDE production began in the basement of the Wolfords' home. Kathryn was involved in the layout and format of the publication. She also participated to a lesser extent in procuring advertising for SAT–GUIDE. In December, 1979, the first SAT–GUIDE magazine was published, taken to a trade show and distributed on a trial basis. The first issue for sale was published in February of 1980, and SAT–GUIDE was published every month thereafter until January, 1986. Even though David conceived the SAT–GUIDE idea in 1979, it was not until 1981 that any salary was paid by CommTek to either party, the first being to Kathryn. David began receiving compensation a year later in 1982. Before that time, i.e., since the parties' marriage in 1978, they had been living off of David's separate property entirely. In fact, the magistrate found that David paid for the parties' normal

living expenses from his separate property until March of 1983.

SAT–GUIDE was, in fact, published by the corporation, CommTek, Inc. Eventually, other magazines were also developed by CommTek, Inc., in connection with the SAT–GUIDE magazine, e.g., SATELLITE ORBIT and SATELLITE DEALER. Kathryn worked on the production of all the SAT–GUIDE magazines, at one point spending as much as 100 hours per week on them. She was intimately familiar with the detail and layout of the magazines. Nevertheless, Kathryn testified that she did not know that SAT–GUIDE was being published by CommTek, Inc., which was David's separate property. The magistrate found otherwise, noting that in each issue of SAT–GUIDE, including the original issue, the following language is contained on either the first or second page:

> December 1979 SAT–GUIDE Magazine is published monthly by COMMTEK Publishing Company, Division of COMMTEK, Inc., P.O. Box 1569, Hailey, Idaho 83333, (208) 788–3101, Copyright * COMMTEK Publishing Company. Contents may not be reproduced in any form without written permission.

The magistrate found that Kathryn's testimony that she was not aware that SAT–GUIDE was published by CommTek, Inc., was inconsistent with her allegation that she was intimately familiar with all the details of the layout and contents of the SAT–GUIDE magazine. It was further inconsistent with her testimony that she spent as much as 100 hours per week working on the magazine. He thus found it inconceivable that she could be so intimately familiar with, and work so hard on, the magazine, and yet not see this printing on the masthead of each publication.

Further, Kathryn conducted herself in a way which showed that she did not believe she had a community property ownership right in the publication. She continually demanded that she be granted stock in the

---

going shall apply to all separate property now owned by either of the parties and to all property which may hereafter be separately

acquired by either of them, in any manner whatsoever.

corporation or an interest in the publication. She continually asked David questions about an ownership interest and asserted that she ought to have a right to an ownership interest in either the publishing company or the corporation.

On June 25, 1982, a Friday night after a long and hard week, the parties were having cocktails and dinner at a bar/restaurant in Hailey. Kathryn again brought up the subject of a community property interest in these assets. In an attempt to calm a potential disturbance, and in order to have a tranquil evening, David wrote a note on a napkin, admitted in evidence as Plaintiff's Exhibit 7, which reads in full as follows:

06/25/82—I David G. Wolford, being of I hope somewhat sound mind but of broken body acknowledge that Idaho being a community property state, that Kathryn A. Wolford, common known as Fetch, has an equal community property interest in the assets and liabilities of CommTek Publishing.

David G. Wolford

I also acknowledge that I love her and half loss debt is hers.

David

After a trial on the issue, the magistrate found that it was David's intention in signing the note to merely acknowledge that the community property laws of Idaho were in effect and that he did not intend to create any greater rights in Kathryn than otherwise existed by law. He made his finding in part on the fact that Kathryn made no effort thereafter to have stock formally transferred into her name and, in fact, did not mention the note again until this divorce proceeding was started. Furthermore, Kathryn did not thereafter act like an owner. She continued to act and speak as though David were the owner in many respects, including acquiescing in his election of directors and continually requesting him to transfer an interest in the business.

After several years, the parties drifted apart and David entered into an extra-marital relationship. David admitting having the extra-marital relationship and therefore the magistrate found Kathryn entitled to a divorce on the grounds of adultery. No alimony was awarded, however, because he found little, if any, evidence in the record justifying an award of alimony or rehabilitation support for Kathryn.

After suit was instituted, a preliminary hearing was held to determine whether the stock in CommTek, Inc., was the parties' community property or David's separate property. The magistrate found that the stock was David Wolford's separate property. He also found (1) that the ante-nuptial agreement was valid and enforceable, (2) that the agreement was not modified, nor was separate property transmuted into community property, by the "napkin note" of June 25, 1982, and (3) that Kathryn should not prevail on her claims of estoppel.

At hearings held later in the year, the magistrate found that although Kathryn, by the ante-nuptial agreement, had relinquished any right to the "increase" in the value of the separate property stock in CommTek, Inc., that nevertheless community efforts were responsible for one-third of its increased value. The magistrate determined that the increase in value of CommTek stock during the marriage was $5,000,000, of which one-third, or $1,666,-666.66, was community property available for division. The magistrate further found that David had not breached any fiduciary duty to Kathryn, that no constructive trust should be imposed on David's shares of CommTek, Inc., that CommTek, Inc., was not David's alter ego, and that the remaining community property should be divided equitably between the parties. Since David controlled the parties' assets almost exclusively, he was awarded most of the assets and was ultimately ordered to pay Kathryn $1,102,200.33 for her community interest.

Both parties appealed from the magistrate's decision. Acting in its appellate capacity, the district court (1) affirmed for the most part the magistrate's findings of fact and incorporated them into its appellate decision because they were supported by substantial competent evidence, but (2) found the enhancement in value of the sep-

arate property stock in CommTek, Inc., to be controlled by *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974). The district court therefore held, as a matter of law, that the magistrate erred in awarding Kathryn any portion of the value of David's separate property stock in CommTek, Inc., based on her services as an employee. The district court held that under *Speer* the proper inquiry is whether the community has been adequately compensated for services in the past. The district court noted that "[a]ll the evidence presented at trial on the issue of compensation was offered by David," which showed that for the years 1978–1985 the parties had been paid an average annual salary of $153,494 (Kathryn's share was $32,940 and David's was $120,554), and that the parties' average annualized salary for the last three years exceeded $380,000 per year.[2] In addition to these salaries, both Kathryn and David enjoyed participation in CommTek's pension plan (David's share alone was valued at $151,085 at the time of divorce and was divided by the trial court as community property). And finally, the company paid the following for both David and Kathryn: family health insurance premiums; trade show and other travel expenses; meal and entertainment expenses; company auto expenses, including fuel, maintenance and insurance; and individual expense accounts. In light of David's unopposed evidence in the record, including testimony from industry experts, the district court concluded that the evidence demonstrated conclusively that the community had been more than adequately compensated for its services and that under *Speer v. Quinlan* Kathryn was not entitled to any of the increase in value of David's separate property stock in CommTek, Inc. Accordingly, the magistrate's determination that Kathryn had a claim to a portion of the increase in the value of CommTek, Inc., stock, as community property, was reversed.

As to the other issues raised on appeal, the district court affirmed the magistrate court's finding, *inter alia:* (1) that the "napkin note" did not transmute David's separate property into community property; (2) that the doctrine of quasi-estoppel should not be applied to this case; and (3) that Kathryn's claimed community property interest in David's background, talent, expertise and knowledge was without merit. Kathryn now appeals from the district court's appellate decision.

## II

■ The parties had a comprehensive ante-nuptial agreement which they entered into prior to the marriage. Therefore, their property rights are determined by that agreement and not by I.C. § 32–901 *et seq.* As stated in I.C. § 32–916, "The property rights of husband and wife are governed by this chapter, *unless* there is a marriage settlement agreement entered into prior to or during marriage containing stipulations contrary thereto." (Emphasis added.) Therefore, since David and Kathryn had a comprehensive ante-nuptial agreement, their respective property rights addressed therein are governed by the agreement. In essence, then, this becomes a contract interpretation case rather than a statutory interpretation case. The contract between the parties varied their respective rights as compared to those contained in the Idaho statutes, as expressly permitted by I.C. § 32–916. For instance, the parties' agreement provided that "any salaries or personal earnings of Kathy derived during their marriage" would remain her separate property, and that "David hereby waives, releases, and renounces, under the laws of any jurisdiction that may be applicable, all right and interest, statutory or otherwise," in Kathy's salaries or personal earnings. However, the parties contracted that the "salaries and personal earnings of David shall be community property." As to the separate property of the spouses, the agreement provided that "each party shall separately retain all rights and have complete control of his or her own separate property, whether now owned or hereafter

---

2. The figures shown include the salaries paid to both David and Kathryn even though, under the ante-nuptial agreement, Kathryn's salary was her separate property and only David's salary was to be considered community property.

acquired, and the rents, profits, and *increase* thereon, ... with the same effect as if no marriage had been consummated between them." (Emphasis added.) Since David and Kathryn entered into that comprehensive ante-nuptial agreement, which the courts below found to have been voluntarily entered into without any fraud or duress, our analysis of the issues in this case will be made with that contractual property regime in mind.

## A. NAPKIN NOTE

■ Appellant Kathryn first contends that the district court erred in finding that the June 25, 1982, "napkin note" did not transmute David's separate property interest in CommTek Publishing into community property. Both the magistrate and the district court found that the "napkin note" did not transfer any interest in CommTek Publishing to Kathryn. There was substantial evidence introduced by both parties as to the circumstances and intent surrounding the execution of the "napkin note."

The lower courts' findings were based on four grounds: (1) the note was ambiguous and unclear on its face and did not appear to be a bona fide attempt to formally transmute any interest in CommTek Publishing or its assets; (2) the note was not acknowledged or proved as required by I.C. § 32–917; (3) the note was written in terms of "the assets and liabilities of CommTek Publishing," but David did not own the assets of CommTek; he owned the stock. David could not have transferred an interest in assets and liabilities without formal approval of CommTek, Inc.'s, board of directors following proper notice; and (4) there was a "severe lack of evidence" showing that David intended a gift by the note.

The district court affirmed the magistrate's determination that the "napkin note" was an attempt to quiet marital discord, rather than an attempt to transmute a multimillion dollar separate property asset into community property, in the face of a valid ante-nuptial agreement expressly preventing such a transmutation. Although there is conflicting evidence, the magistrate's findings are supported by substantial competent evidence, as the district court found, and are not clearly erroneous. I.R.C.P. 52(a); *Golder v. Golder*, 110 Idaho 57, 714 P.2d 26 (1986). Further, the Idaho community property laws contain strict and explicit ways for property to be transmuted from separate status to community property status. As stated in *Stockdale v. Stockdale*, 102 Idaho 870, 873, 643 P.2d 82, 85 (Ct.App.1982), "[A]lthough husband and wife may elect at any time to change their property rights, they must engage in certain formalities." Moreover, the party alleging the transmutation has the burden of proving the transmutation. *Hooker v. Hooker*, 95 Idaho 518, 511 P.2d 800 (1973). Here, the magistrate court found that Kathryn failed to sustain her burden of proving a transmutation; neither had she shown that the formalities required in I.C. §§ 32–917 through –919 had been followed. The magistrate's findings are supported by substantial competent evidence, and we affirm those findings.

## B. QUASI–ESTOPPEL

■ Kathryn next contends that the lower courts erred in failing to apply the doctrine of quasi-estoppel against David based upon his representations contained in the "napkin note." We disagree. The doctrine of quasi-estoppel is a method whereby an aggrieved party can obtain relief through the court's equitable powers from what appears, at first glance, to be an oppressive result at law. This Court set down the rules for the application of quasi-estoppel in *Dawson v. Mead*, 98 Idaho 1, 557 P.2d 595 (1976). There we stated:

> To constitute quasi-estoppel [a person against whom estoppel is sought] must have gained some advantage for [him]self, produced some disadvantage to [the person seeking estoppel], or induced him to change his position. It must be unconscionable to allow [a person against whom estoppel is sought] to maintain a position which is inconsistent with one of which [he] accepted a benefit.

98 Idaho at 4, 557 P.2d at 598. The magistrate here, however, found none of the

requisite elements. Instead, he found, as a matter of fact, that: (1) "There is no evidence that Kathryn would have done anything different had the note never been written"; (2) "Kathryn was well aware that David did not consider CommTek, Inc., half hers, and she did not act upon David's note or any of his alleged representations to her detriment"; and (3) "Kathryn did not ... [after the napkin note was penned] act like an owner. She continued to act and speak as though David were the owner in many respects...." Based on these factual findings, and based on the ante-nuptial agreement's express reservation of CommTek, Inc., as David's separate property, the magistrate found that "it is not unconscionable for David to retain all of CommTek, Inc."

These specific factual findings were affirmed by the district court on appeal because, as the district court noted, under I.R.C.P. 52(a) "[f]indings of fact shall not be set aside unless clearly erroneous." The district court concluded that there was a great deal of evidence supporting the magistrate's factual findings, and therefore they were not clearly erroneous. We agree and affirm.

### C. KNOWLEDGE, BACKGROUND AND TALENTS

■ Kathryn also contends that the magistrate erred when he determined that David's knowledge, background and talents were his separate property. The magistrate did not, however, determine that David's knowledge, background and talents, as such, were his separate property. Rather, he simply concluded that any increase in the value of CommTek, Inc., "due to David's own talents and background would remain David's separate property."

Nevertheless, in response to this claim raised by Kathryn, we note that David's knowledge, background and talents, being personal, physical or intellectual attributes, cannot be categorized as property, either separate or community. Appellant cites to no authority holding to the contrary. To the extent these attributes enhance his earning capacity, they may produce income which, under the ante-nuptial agreement, was agreed to be community property. However, they are not in themselves community property. An award of one spouse's knowledge, background and talent to the other spouse is no more possible than awarding one spouse's beauty or stature to the other spouse. Personal attributes can enhance income which, in the absence of an ante-nuptial agreement to the contrary, is community property, I.C. § 32–906; however, personal attributes are not property. Thus, they cannot be classified as community property, nor can they be apportioned between spouses upon divorce.

### D. THE ENHANCEMENT OF THE COMMTEK STOCK ISSUE

■ Appellant's final contention is that the district court, acting in its appellate capacity, erred in its application of *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974), to this case. Kathryn contends that the "adequacy of compensation" analysis delineated in *Speer* is not applicable. She contends that since community contributions increased the value of the CommTek, Inc., stock, she should be entitled to share in that increased value of David's separate property stock in CommTek, Inc. She claims that whether the community was adequately compensated is not pertinent.[3]

---

**3.** The ante-nuptial agreement provided that "[e]ach party shall separately retain all rights and have complete control of his or her own separate property, whether now owned or hereafter acquired, and the rents, profits, and *increase* thereon, ... with the same effect as if no marriage had been consummated between them." (Emphasis added.) It may well be that under the property regime contracted between the parties in their ante-nuptial agreement that neither party was entitled to any interest in the "increase" in their separate property, regardless of whether that increase was attributable to community efforts. Thus, it may be that the district court's decision could be affirmed based upon this specific provision in the ante-nuptial agreement, regardless of whether that increase was the result of the personal efforts of David. We need not resolve that question, however, since we agree with the district court's analysis that, even assuming that the ante-nuptial agreement did not preclude Kathryn from claiming an interest in David's separate property stock in CommTek, Inc.,

The same argument was advanced in *Speer*. In fact, "[t]he principal issue in [*Speer* was] whether Mrs. Speer [was] entitled to share in the increase in value of Speer, Inc., a close corporation, in which her husband was a majority stockholder and important employee during part of their marriage, on the ground that such increase resulted from community efforts, industry and other contributions." 96 Idaho at 124, 525 P.2d at 319. Both Kathryn in this case, and Mrs. Speer in the *Speer* case, wanted to share in the increase in value of the separate property closely-held corporation on the grounds that the increase was a result of community efforts, industry and other contributions. However, this Court in *Speer* resolved that issue contrary to Kathryn's claim.

This Court, in *Speer*, delineated the requisite analytical process:

[B]roadly speaking, community effort which benefits the separate estate of one of the spouses should not go unrewarded. However, the community property statutes in Idaho do not contemplate that upon marriage the interests of each spouse in his or her separate property be assimilated by the community.

*Accordingly, if community efforts and ability have been expended in the conduct of a separate property business, a proper inquiry upon the dissolution of that marriage is whether the community has received fair and adequate compensation for its labor. Such a rule strikes a balance between the legitimate claims of both the separate and community estates.*

In determining whether the community has been adequately compensated for its labor over the period of the marriage, the trial court should take the following factors into consideration: the nature of the business, the size of the business, the number of employees, the nature and extent of community involvement in the conduct of the business, the growth pattern of the business. (Did it steadily enhance in value? Did periods of prosperity alternate with periods of decline?) Once these questions are answered, the proper inquiry is whether the over-all compensation received by the community for its contribution to the conduct of the business was equivalent to the compensation which the business would have had to pay to secure a non-owner employee to perform the same services which were rendered by the community. A relevant type of evidence for determining the adequacy of community compensation for its efforts would be evidence relating to the salaries of non-owner employees at the same level of responsibility in comparable types of businesses in the same area of the country. If it is found that the community has been deprived of adequate compensation for its services, the community would be entitled to a judgment against the owner spouse equivalent to the difference between the income actually received by the community in the form of compensation from the business, and the income which the community would have received had the owner-spouse been justly compensated.

96 Idaho at 128, 525 P.2d at 323 (emphasis added). Thus, under the analysis contained in *Speer*, whenever one party to a marriage claims that he or she is entitled to share in the increase in value of a separate property business in which one of the parties was an employee during the marriage, the proper inquiry upon dissolution of the marriage is whether the community has been adequately compensated for its labor. And in determining adequate compensation, a three-pronged analysis is called for. First, business factors should be considered. Second, once the business factors have been considered, the question is whether the overall compensation received by the community was equivalent to the compensation that would have been necessary to secure a non-owner employee to perform the same services the community rendered. And third, if it is found that the community has been under-compensated, the community is

the uncontradicted evidence in the record demonstrates that the community was adequately compensated, and therefore under *Speer v. Quinlan*, the community has no claim against David's separate property stock in CommTek, Inc.

then entitled to a judgment against the owner-spouse equivalent to the deficiency found. If, however, no deficiency is found, the community has no claim.

In the instant case, the district court correctly noted that "all the evidence presented at trial on the issue of compensation was offered by David." David presented substantial evidence regarding the adequacy of the compensation paid to both David and Kathryn. That evidence included the testimony of several witnesses, including recognized experts in the publishing industry, who testified to the effect that non-owner employees could have been hired to perform the same or similar services for less than David and Kathryn were compensated. The evidence in the record was uncontroverted that David and Kathryn were adequately compensated. In fact, the district court noted that they were probably over-compensated.

In analyzing this compensation issue, the district court correctly followed the *Speer* analysis by first examining the business factors taken into consideration and then the expert testimony which was rendered. In particular, Mr. Peter Craig, a certified public accountant and recognized consultant to the publishing industry, based his opinion on his general knowledge of salaries in the publishing industry (in both start-up and established companies), interviews with employees (including Kathryn), and his general review of the company's operations. In addition, Mr. Craig relied upon an editorial salary survey which reflected 1986 salaries for the industry and was categorized by job description, region, average editorial pages, number of editorial employees supervised, frequency, circulation, sex, years in the business and number of magazines the employee supervised.

The district court next considered testimony regarding the overall compensation received by the community during the years in question, *Speer*, 96 Idaho at 129, 525 P.2d at 324 ("[T]he court should examine the overall amount of compensation to the community during those years, including bonuses and fringe benefits."), and compared it with the compensation necessary to secure a non-owner employee to perform the same services. For the years 1978 through 1985, Mr. Craig testified that Kathryn's salary should have totaled approximately $171,945, and that David's salary should have been in the range of $355,000. In actual fact, Kathryn's salary for the period was $263,517 [4] and David's was $964,438. That uncontroverted evidence amply supports the district court's conclusion that Kathryn and David were both adequately compensated, indeed, over-compensated. Additionally, these figures do not include the parties' benefits in CommTek, Inc.'s, pension plan (both Kathryn and David were covered under the pension plan and David's share alone was valued at $151,085 at the time of divorce), nor do they include the value of fringe benefits the company paid for both Kathryn and David (including family health insurance premiums, trade show and travel expenses, meal and entertainment expenses, company auto expenses, and individual expense accounts).

The evidence in the record before the district court showed that the community, at a minimum, had been adequately compensated; therefore, it has no claim against David's separate property interest in the stock of CommTek, Inc., and the district court correctly so held.[5] Finding no error, we affirm the district court in its handling of this issue.

---

**4.** Kathryn's 1985 salary was computed on an annualized basis.

**5.** Under the express terms of the ante-nuptial agreement, Kathryn's salary and personal earnings were to remain her separate property—only the salary and personal earnings of David were to be community property. Nevertheless, even if the value of Kathryn's salary, personal earnings, pension account and fringe benefits are excluded from the analysis, it is still clear that the community was more than adequately compensated for David's labors. As noted

above, Mr. Craig testified that Kathryn, in order to be adequately compensated, should have received $171,945 for the 1978–1985 period, and David, in order to be adequately compensated, should have received $355,000. When added together, those two figures total $526,945. When this figure is contrasted with the $964,438 actually received by David, and established as community property under the ante-nuptial agreement, it is abundantly clear that the community was adequately compensated. The above figures do not include the value of the

The district court's amended memorandum decision and order on appeal, filed February 11, 1988, is affirmed. Costs to respondent. No attorney fees.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

I agree with the magistrate's determination that Kathryn Wolford was entitled to the adjudicated portion of the post-marital increase in the value of Commtek, Inc., stock. This is not to say that the majority opinion went awry by referring to *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974). It is to say that a correct reading of *Speer* allows the trial court considerable discretion in determining whether and to what extent the marital community is entitled to be credited for the increased value in an asset which was at marriage the separate property of one of the parties—in this case the separate estate of the husband.

The majority quotes with approval the passage from *Speer* that "*the trial court should take the following factors into consideration:....*" 96 Idaho at 128, 525 P.2d at 319 (emphasis added). There is no indication from the majority opinion that the trial court took the wrong factors into consideration, or did not weigh the correct factors when it awarded some of the increased value in Commtek stock to Kathryn. Without such a determination, there appears to be no reason for supplanting the trial court's decision with a decision of this Court or with a decision of the district court sitting in an appellate capacity.

Appellate courts sit to ascertain the existence of prejudicial error, but that does not encompass the rendering of *de novo* decisions on the merits without first establishing error. The record in this case amply sustains a conclusion that a most thoroughly prepared ante-nuptial agreement was drawn so as to preserve to each party his/her pre-marital estate, and any increase therein—if it was attributable to the owner thereof. The agreement did not anticipate that community effort would result in a substantial increase in the value of the CommTek pension plan or the fringe benefits

separate estate of just one party—in this case that of the husband.

And, as Kathryn's counsel appropriately points out in their brief to this Court:

> It is well established in this jurisdiction that when community efforts, labor, industry or funds enhance the value of separate property, such enhancement is community property for which the community is entitled to reimbursement. In the decision of *Gapsch v. Gapsch*, 76 Idaho 44, 277 P.2d 278 (1954), the Idaho Supreme Court set forth the following proposition:
>
>> As a general rule, the natural enhancement in value of separate property during coverture does not constitute community property; however, to the extent an enhancement in value is due to community efforts, labor, industry or funds, it falls into the community. 41 C.J.S., Husband and Wife, § 479, b., p. 1015. 76 Idaho at 52, 277 P.2d at 282.

Plaintiff-appellant's brief, 42–43. The brief goes on to state that the principle announced in *Gapsch* has been often reaffirmed. I see no reason now to disturb this precedent, or the thoughtful determination by the trial court in this instance.