32 P.3d 140

Bill Rex CHANDLER, Plaintiff–
Respondent,

v.

Susan C. CHANDLER, Defendant–
Appellant.

No. 26416.

Supreme Court of Idaho,
Twin Falls, March 2001 Term.

Aug. 7, 2001.

Rehearing Denied Sept. 28, 2001.

248

David H. Leroy, Boise, and Roger E. Crist, Ketchum, for appellant. Roger E. Crist argued.

Hogue & Dunlap, L.L.P., Hailey, for respondent. Tracy Dunlap argued.

SCHROEDER, Justice.

This is an appeal from a district court order that affirmed the findings of a magistrate court regarding the valuation of the parties' community business and the calculation of the husband's income for the purpose of determining support payments.

## I.

## FACTS AND PROCEDURAL BACKGROUND

Susan and Rex Chandler were married on September 22, 1981. They had one child during the marriage, Tyler Rex Chandler, born February 9, 1988.

The Chandlers have been involved in the restaurant industry, on varying levels, for several years. Susan has held lower level positions, while Rex has acted as director and overall manager in several fine-dining establishments in Hawaii and California. The Chandlers acquired ownership interest in several of these restaurants. Although the restaurants experienced periods of substantial expansion and success, the parties suffered a business and personal bankruptcy in 1991.

The Chandlers moved to Honolulu, Hawaii, in 1992, where Rex was employed as general manager of a restaurant and nightclub, earning $100,000 per year. In 1993, Rex accepted a position as director of operations of a resort in South Lake Tahoe, California, where he was paid a salary of $60,000 per year, plus housing and benefits.

In June of 1994, Rex was contacted by a friend living in Ketchum, Idaho, and was told of the opportunity to rent a small restaurant space in Ketchum that had been vacated by another restaurant. Rex investigated the opportunity and concluded he could create a fine-dining restaurant there. Because of their financial difficulties, the Chandlers could not qualify for a conventional loan. Rex's mother, Radie Chandler, refinanced her home and loaned the parties approximately $105,000 to open the restaurant.

The parties moved to Ketchum in August of 1994. Chandler's Restaurant opened in November of 1994 as a sole proprietorship. The business was incorporated in February of 1995, as Chandler's Restaurant, Inc. Rex manages every aspect of the restaurant and works ten or more hours a day and often works on his days off, commonly up to sixty hours per week.

Rex filed a complaint for divorce in July of 1998. The parties stipulated to joint custody of Tyler and to the allocation of personal property but went to trial on other issues.

The trial court awarded the community property business (the restaurant) to Rex and ordered Susan to transfer her fifty-percent interest in the business to Rex in exchange for one-half of the value of the business, determined by the trial court to be $21,000. The trial court ordered Susan to use those funds to pay her attorney fees. In addition, the trial court fixed child support pursuant to the child support guidelines based upon the trial court's determination that Rex's total income is $65,000 per year. The trial court awarded Susan eight months of alimony of $1,800 per month.

Susan appealed to the district court, alleging that the trial court undervalued the community property business and that the trial court erred in calculating Rex's income for support purposes. The district court affirmed the magistrate court's findings. Susan appealed to this Court.

## II.

### STANDARD OF REVIEW

■ "The disposition of community property is left to the discretion of the trial court, and unless there is evidence in the record to show an abuse of that discretion, the award of the trial court will not be disturbed." *Maslen v. Maslen,* 121 Idaho 85, 88, 822 P.2d 982, 985, *citing Koontz v. Koontz,* 101 Idaho 51, 52, 607 P.2d 1325, 1326 (1980). In reviewing an exercise of discretion, this Court conducts a multi-tiered inquiry: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989), *citing Associates Northwest, Inc. v. Beets,* 112 Idaho 603, 605, 733 P.2d 824, 826 (Ct.App.1987); *Sun Valley Shopping Center, Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

■ Encompassed in the disposition of community property is the determination of the value of that property. The Court has held that in "divorce proceedings the determination of the value of community property is within the discretion of the trial court and will not be disturbed on appeal if it is supported by substantial competent evidence." *Maslen,* 121 Idaho at 90, 822 P.2d at 987, *citing Shumway v. Shumway,* 106 Idaho 415, 679 P.2d 1133 (1984); *Martsch v. Martsch,* 103 Idaho 142, 645 P.2d 882 (1982). The trial court, "not this Court on appeal, resolves the conflicting evidence and determines the weight, credibility and inferences to be drawn" from the evidence. *McAffee v. McAffee,* 132 Idaho 281, 287, 971 P.2d 734, 740 (Ct.App.1999), *citing Weilmunster v. Weilmunster,* 124 Idaho 227, 238, 858 P.2d 766, 777 (Ct.App.1993).

■ The Court reviews the magistrate's award of child support under an abuse of discretion standard. *Henderson v. Smith,* 128 Idaho 444, 451, 915 P.2d 6, 13 (1996), *citing Noble v. Fisher,* 126 Idaho 885, 888, 894 P.2d 118, 121 (1995). The appellant bears the burden of establishing that the magistrate's calculations constituted an abuse of discretion. *Id.*

■ In regard to spousal maintenance, the Court reviews the trial court's findings "that are the basis for the court's decision as to the duration and the amount of spousal maintenance to determine whether there exists substantial and competent evidence in support of these findings." *Wilson v. Wilson,* 131 Idaho 533, 535, 960 P.2d 1262, 1264 (1998), *citing Mulch v. Mulch,* 125 Idaho 93, 98, 867 P.2d 967, 972 (1994); *Tisdale v. Tisdale,* 127 Idaho, 331, 333, 900 P.2d 807, 809 (Ct.App.1995).

## III.

### THE TRIAL COURT INCORRECTLY CALCULATED THE VALUE OF THE COMMUNITY PROPERTY BUSINESS.

The core of the arguments surrounding this issue revolves around the "goodwill" value, if any, of the community business. It is important to note that the trial court found that Rex's expertise in the restaurant business is not community property, thus cannot be valued as goodwill. The goodwill value at issue in this case is the goodwill of the community business itself, Chandler's Restaurant, Inc. Despite the business' negative asset to debt ratio, the trial court stated "the Court cannot conclude that the corporation has a negative value, or that it should be valued at less than zero (0) for purposes of property division." The trial court found that the community business had some "value" distinguishable from Rex's personal goodwill. That value can only be categorized as the goodwill of the community business itself.

■ Two values must be considered when determining the overall value of a business: intangible assets and tangible assets. The value of the business is determined when the two factors are combined. "Goodwill" (an intangible asset) is an appropriate factor in determining the value of a business. *Olsen v. Olsen,* 125 Idaho 603, 606, 873 P.2d 857, 860 (1994). Goodwill represents "the advantage or benefit, which is acquired by an

establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence...." *Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555, 113 S.Ct. 1670, 1675, 123 L.Ed.2d 288, 299 (1993); *see also Harshbarger v. Eby,* 28 Idaho 753, 761, 156 P. 619, 621 (1916); *Loveland v. Loveland,* 91 Idaho 400, 402, 422 P.2d 67, 69 (1967). Goodwill is not the equivalent of future earnings. *See In re marriage of Bookout,* 833 P.2d 800, 804 (Colo.App.1991), *citing In re Marriage of Lukens,* 16 Wash.App. 481, 558 P.2d 279 (1976); *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1 (1983) (other citation omitted); *see also In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175 (1984) ("Goodwill is a property or asset which supplements the earning capacity of another asset, a business, or a profession, and, therefore, it is not the earning capacity itself."). Rather, "relative to marital dissolution, goodwill represents the ability of a business to earn money after the divorce based on efforts made during the marriage ... to the extent future profits are likely due to circumstances that exist at the time of the dissolution, they should be reflected in the value of the business." Richard E. Poley, *Valuing Business Goodwill in a Divorce,* 26 APR COLO. LAW. 53 (1997).

 Determining a value to assign to the goodwill of a business is the most complex aspect of a court's determining a business's overall value. There are many accepted methods that experts use to estimate a business' goodwill value. The goal of utilizing these various methods is to enable the trial court to accurately approximate a business's true "value," that is, what a willing buyer would pay a willing seller for the business, in this case, what a willing buyer would pay for Chandler's Restaurant, Inc., based on its community reputation, established patronage, and other factors based on efforts made during the marriage that exist at the time of dissolution.

 How the trial court assesses and weighs each method and variable with it, in each particular case, is within that court's discretion. This Court and the Court of Appeals have recognized the validity of several of these valuation "methods." *See Olsen, supra.* In *Olsen* and *McAffee, supra,* the Court addressed the excess earnings method and net asset value method and in *McAffee,* the Court of Appeals addressed the capitalized excess earnings method and the straight capitalization of earnings method. Other widely used methods utilized in determining the goodwill value of a business that have been used by other courts include the market value or fair market value method, the buy sell agreement method and the IRS method. *See In re Marriage of Hall,* 103 Wash.2d 236, 244, 692 P.2d 175, 180 (1984); *Hoeft v. Hoeft,* 74 Ohio App.3d 809, 600 N.E.2d 746 (1991); *Ritz v. Ritz,* 166 A.D.2d 568, 560 N.Y.S.2d 853 (1990); *Mocnik v. Mocnik,* 838 P.2d 500 (Okla.1992). These valuation methods are not the exclusive methods available to a trial court in determining the value of a community business. The Court has repeatedly stated that the valuation of community property is within the discretion of the trial court. *See Maslen,* 121 Idaho at 90, 822 P.2d at 987. However, if a trial court purports to use a specific valuation method in determining the value of a community property business and misapplies the formula associated with that method, the case will be remanded back to the trial court for proper application of the valuation formula. *See Olsen, supra.*

 In this case the trial court discussed various valuation methods in determining the value of Chandler's Restaurant, Inc. Both parties agree that the trial court applied a capitalized earning formula to determine the value of the community business. However, the parties disagree as to whether the trial court properly applied the formula. "Under the capitalized excess earnings method, the value of a business is determined by multiplying the net excess earnings of the business by a predetermined capitalization rate...." *McAffee,* 132 Idaho at 287, 971 P.2d at 740. First, the average net income is determined. Next, the appropriate salary equal to the amount it would take to attract a new employee to replace the owner or opera-

tor, accounting for skill, experience and reputation, is subtracted from the earnings. *Id.* The result is the excess earnings of the business. The figure is then multiplied by the capitalization rate and the resulting amount is considered goodwill. *Id.* "This amount is added to the adjusted net tangible assets to arrive at the total value of the business." *Id.*

■■■ Using the capitalized excess earnings method, goodwill (the intangible asset) should be added to the net tangible assets (tangible assets less liabilities [1]) to arrive at the total value of the business. *Id.*

■■■ The trial court used Rex's expert, Mr. Lallman's figure of $42,000 as net income figure and multiplied it by an agreed upon capitalization rate of 20%, resulting in a goodwill value figure of $210,000. *See McAffee,* 132 Idaho at 287, 971 P.2d at 740 (A business' goodwill value is calculated by multiplying the excess earnings or net income of the business by the capitalization rate.). From that figure, the trial court subtracted the debt of the corporation estimated by Mr. Lallman to be $188,000. The trial court arrived at the value of the business by subtracting the business's liabilities from the business's goodwill without accounting for the business's assets, therefore the significance of the business debts is exaggerated. However, following the capitalized excess earnings method, the goodwill value of the business, determined by the trial court to be $210,000, needs to be added to the net tangible assets of the business (tangible assets minus liabilities) in order to reach a reasonable value figure. If the trial court finds that liabilities exceed tangible assets, then the appropriate amount needs to be deducted from the $210,000.[2] The fact that liabilities may exceed tangible assets is irrelevant in application of the formula. The assets must be included in the calculation for proper application of the formula.

Rex argues that the trial court found no goodwill value in the business, that the judge was simply trying to "reach out" to Susan in setting the value of the business at $21,000. The record does not support this argument. The trial court carefully assessed the testimony of all of the expert witnesses regarding the value of the business. The trial court found "that profits have taken hold and there is no reason to believe that they will suddenly discontinue unless some significant shake-up occurs, such as a poor ski year, or a change in management or key personnel." The trial court found that the "business does generate cash flow each year, and will likely continue to do *so so long as Rex operates it.*" (Emphasis in original). Accordingly, the trial court stated that the "Court cannot conclude that the corporation has a negative value, or that it should be valued at less than zero (0) for purposes of property division."

In this case the trial court properly perceived the issue as one of discretion and acted consistently with the applicable legal standards and reached its decision by an exercise of reason. *See Hedger,* 115 Idaho at 600, 768 P.2d at 1333. However, in its valuation of the community business, the trial court did not follow the valuation method/formula it purported to apply and pursuant to *Olsen, supra,* the case must be remanded to the trial court to recalculate the value of the Chandlers' community property and business, either utilizing the capitalized excess earnings formula as outlined in this opinion or another that reflects the value of the business.

### IV.

### THE TRIAL COURT ERRED IN CALCULATING REX'S INCOME FOR THE PURPOSE OF ESTABLISHING CHILD SUPPORT.

For the purpose of establishing the value of the business, the trial court found that a

---

1. Net assets are defined by Black's Law Dictionary as the excess of total assets over total liabilities. Similarly, book value is the value of the business's tangible assets depreciated, as allowed by the I.R.S. less liabilities. 8 AM.JUR. PROOF OF FACTS 3d § 215 at 228 n. 25 (Goodwill Valuation).

2. The trial court uses the terms "income method", "return on investment" and "capitalized

excess earnings" method interchangeably throughout the opinion. However, even if the trial court applied a valuation method that is not memorialized, the method used does not adhere to the fundamental underpinning of business valuation that is, intangible assets added to net tangible assets equals the value of a business.

"non-owner employee to replace Rex would cost the corporation, at a minimum, sixty-five thousand dollars ($65,000) per year." The trial court also found that for the purposes of computing child support, an income of $65,000 was attributable to Rex.

In analyzing Rex's income for the purpose of determining the amount of support, the trial court relied on the 1998 financial records for the corporation, which indicate that Rex receives $5,417 per month, which totals $65,004. The trial court stated that Rex will have an income of approximately $65,000 per year or more, plus some "perks." The trial court found that these "perks" provide Rex with additional means to discharge personal debt and pay support. The amounts at issue include $2,800 in tip income and $3,600 in rent income, totaling $6,400.

 Furthermore, the trial court failed to deduct the $1,800 per month spousal maintenance payments Rex was ordered to pay Susan from Rex's income. Section 7 of the Idaho Child Support Guidelines allows for a deduction in gross income for spousal maintenance payments prior to the calculation of child support payments. Upon remand, the trial court needs to recalculate Rex's income to include the additional income received from "perks" and to deduct spousal support payments for those months at issue.

## V.

## THE TRIAL COURT FINDINGS REGARDING SPOUSAL MAINTENANCE ARE SUPPORTED BY SUBSTANTIAL AND COMPETENT EVIDENCE.

 In regard to spousal maintenance, the trial court considered the fact that Rex had been providing Susan with at least $2,300 per month while the divorce was pending, the fact that Rex was to pay the majority of the community debt, and the fact Susan was capable of finding full-time employment. The trial court ordered Rex to pay $1,800 per month for eight months. There is substantial and competent evidence in the record to

support this award. If the trial court determines that Susan was eligible to receive additional spousal maintenance taking into account the additional "perk" income discussed above, the trial court is free to make such an order, as the determination of duration and amount of spousal maintenance is within the trial court's discretion.

## VI.

## CONCLUSION

Based on the foregoing discussion, the case is remanded to the magistrate court for the recalculation of the value of the community business, as well as the recalculation of child support and spousal maintenance payments. If necessary, the magistrate court may reconsider the allocation of debt payment in reaching a final decision. No costs or attorney fees allowed.

Chief Justice TROUT, Justices WALTERS and KIDWELL concur.

Justice EISMANN concurring in the result in Part III and concurring in Parts I, II, IV, and V.

## THE TRIAL COURT INCORRECTLY CALCULATED THE VALUE OF THE COMMUNITY PROPERTY BUSINESS.

I agree that the trial court incorrectly calculated the value of the community property business. I cannot agree with the majority's statement that the trial court found there was any value in the business' goodwill. Likewise, I cannot agree with statements in the majority opinion which, in effect, will transform a spouse's ability to earn above-average income after the divorce into community property by calling it business goodwill.

1. **The majority opinion misstates the trial court's finding as to the value of the business' good will.**

The majority states that the trial court found the goodwill value of the community restaurant to be $210,000.[3] In actuality, the

---

3. The majority states, "The trial court used Rex's expert, Mr. Lallman's figure of $42,000 as net income figure and multiplied it by an agreed

trial court found that the goodwill value of the business was zero, as shown by the following quotations from the trial court's findings of fact:

109. The court recognizes a distinction between "goodwill" which may be attributable to the business alone (assuming competent but interchangeable management) and goodwill which is specifically related to the reputation and the public's experience with an individual, such as Rex.

. . . .

134. . . . In Mr. Lallman's opinion, Chandler Restaurant does not have goodwill which is distinguishable from Rex's personal goodwill.

. . . .

139. Lallman's [sic] also analyzed the value of the goodwill under the "Rule of Thumb Method", whereby you take the cash flow and use a multiplier. In analyzing value under this method Mr. Lallman identified several reasons why he felt no "goodwill" existed, all of which appeared valid to the Court. Mr. Lallman has applied various methods and arrived at similar results from each method. The Court finds Mr. Lallman's analysis and testimony persuasive.

In its conclusions of law, the trial court stated:

7. Rex's skill and expertise in the restaurant business is not community property nor can it [be] valued as goodwill in the corporation, and is not subject to division in the divorce.

8. The Court has concluded that most of the corporation's success and continued ability to remain successful are due to Rex's personal efforts and expertise.

The trial court made several findings as to why there was no value to the restaurant's goodwill.

134. In addition, Mr. Lallman looked at the various traditional indicia of a "goodwill" value independent of the owner-operator's personal reputation. Mr. Lallman found the Lease to be good, but of only a five (5) year duration before it moves to "fair market rental" and therefore has no

upon capitalization rate of 20%, resulting in a

special value. The location is a cozy structure, but such atmosphere is not unique in Ketchum and the building is old, small, not located on a main traffic thoroughfare, and not subject to expansion under current zoning. The employee work force is competent and stable, but no long-term employment contracts exist; significantly, one (1) employee, Keith Otter, left his employment with Chandler's Restaurant to open a competing restaurant in Ketchum. Mr. Lallman cited many examples of restaurants in the Ketchum/Sun Valley area which have simply closed and liquidated equipment rather than selling as going concerns. Historically, in and around the Ketchum area, the Court finds that to be the general rule. In Mr. Lallman's opinion, Chandler's Restaurant does not have goodwill which is distinguishable from Rex's personal goodwill.

. . . .

138. This restaurant, like most in Ketchum, also presented several special high risk factors to a hypothetical investor: (1) ease of entry into the market, particularly for someone of Rex's qualifications; (2) difficulty of attracting and keeping good employees; (3) the fact that a resort community does not have a good long term customer base; (4) if Sun Valley experiences a poor ski year all the restaurants in the valley suffer. The Court finds the restaurant competition in the Ketchum/Sun Valley area is *extreme*. . . .

. . . .

140. The business of Chandlers is seasonal and relies heavily on tourists. Heavy "slack" periods occur for at least three (3) months, business is probably marginal for at least another three (3) months, and good for only six (6) months out of each particular year. The restaurant, therefore, does not have constant or habitual customers in the sense that a restaurant in downtown Boise might. Undoubtedly, there is some local trade, and there are some repeat customers that do not live in town (part-time residents). However, this heavy reliance on tourism means that

goodwill value figure of $210,000."

goodwill (the propensity of old customers to return) is limited, and that keeping the restaurant profitable is a constant exercise in attracting new customers. Any *new* restaurant can do that.

. . . .

145. The Court also finds Rex's personal attention to the detail of the operation of the business has developed a good reputation for the business, but that reputation is not something which would be saleable if Rex were not to continue in his employment in the business. Rex has no non-competition agreement with the corporation. (Citation and footnote omitted; emphasis in the original.)

It is clear from reading the trial court's findings of fact that the trial court found that the business goodwill had no value.

## 2. The trial court incorrectly calculated the value of the community property business.

The trial court found, "A factor essential to the creation of Chandler's Restaurant was the owner/manager's willingness to take on personal debt to start the restaurant." To do so, Rex obtained two loans from his mother in the sums of $10,000.00 and $105,508.69. She obtained money to make the loans by refinancing her home. At the time of the divorce, the principal owing on these loans was approximately $105,000. In addition, the trial court found that the restaurant (and the parties) owed approximately $26,000 in bank loans and $31,500 to $35,000 to the Internal Revenue Service. The trial court did not make any finding as to the value of the restaurant's physical assets, but the opinions offered during trial all placed that value at less than the amount of the debts. If someone were to purchase the restaurant for an amount sufficient to pay the debts, the purchaser would, in essence, simply be purchasing the physical assets for more than they are worth. As found by the trial court, "There is no reason for a potential restauranteur [sic] to pay a premium to purchase Chandler's Restaurant, Inc., including payment of significant existing debts, when he or she could open a restaurant for less."

Because Rex is able to generate income while operating the restaurant, however, the trial court found that it had a value of $21,200 based upon the "Return on Investment Method (Income Approach)" for valuing the corporation.

141. The business does generate cash flow each year, and will [be] likely to continue to do so *so long as Rex operates it. In Rex's hands, the restaurant will likely continue to generate cash flow sufficient to meet the needs of the business and satisfy its creditors over the long term.* Indeed, during the separation of the parties, the restaurant has generated sufficient cash flow to support both parties in two households. Accordingly, the Court cannot conclude that the corporation has a *negative* value, or that it should be valued at less than zero (0) for purposes of property division.

. . . .

146. In using the Return on Investment Method (Income Approach) favored by Mr. Hecker, but also done by Mr. Lallman as a check against his other calculations, both Mr. Hecker and Mr. Lallman concluded a discount rate of twenty percent (20%) to be appropriate. At that rate, under Lallman's calculations, the business would have a value of Twenty-one Thousand Two Hundred Dollars ($21,200).

147. The Court concludes that the value of the stock in Chandlers is, at the most, Twenty-one Thousand Two Hundred Dollars ($21,200). The overall debt of the parties, independent of business debt, exceeds this value of the corporation. The business still has the ability to generate cash (and "perks") *separate and distinct from the valuation of the business for community division purposes.* The Court will consider this, together with the limited value of the corporation, in allocating the payment of the debts between the parties and in considering support. (Emphasis in the original.)

As the majority acknowledges, the "value" of a business is "what a willing buyer would pay a willing seller for the business." The trial court, however, found a value based upon Rex's ability to earn income in the business

after the divorce based upon Rex's personal attributes.

141. The business does generate cash flow each year, and will [be] likely to continue to do so *so long as Rex operates it. In Rex's hands, the restaurant will likely continue to generate cash flow sufficient to meet the needs of the business and satisfy its creditors over the long term.* ... Accordingly, the Court cannot conclude that the corporation has a *negative* value, or that it should be valued at less than zero (0) for purposes of property division. (Emphasis in original.)

The trial court found that the restaurant had a value to Rex based upon his ability, due to his own personal attributes, to generate income after the divorce by operating the restaurant. That calculation of value is not "what a willing buyer would pay a willing seller for the business." A will buyer could not purchase Rex's personal attributes. Therefore, the trial court erred in its finding of value. I agree that the trial court must re-determine the value of the restaurant.

**3. The majority opinion transforms a spouse's ability to earn above-average income after the divorce into community property by calling it business goodwill.**

The majority states that business goodwill is calculated as follows:

First, the average net income is determined. Next, the appropriate salary equal to the amount it would take to attract a new employee to replace the owner or operator, accounting for skill, experience and reputation, is subtracted from the earnings. The result is the excess earnings of the business. The figure is then multiplied by the capitalization rate and the resulting amount is considered goodwill. (Citations omitted.)

In support of its view that the trial court found there was goodwill value in the business, the majority then states:

The trial court found "that profits have taken hold and there is no reason to believe that they will suddenly discontinue unless some significant shakeup occurs, such as a poor ski year, or a change in management or key personnel." The trial court found that the "business does generate cash flow each year, and will likely continue to do so *so so long as Rex operates it.*" (Emphasis in original).

The majority concludes that as long as Rex continues to operate the restaurant after the divorce, it will make money, and therefore it has goodwill valued at $210,000. By basing the value of business goodwill upon a spouse's ability to earn above-average income after the divorce, the majority has converted post-divorce, separate property earnings into community property.

The majority's calculation of "goodwill" is based upon the business' projected future ability to earn above-average income. The majority first would calculate the business' "excess earnings" by deducting from its net income an amount necessary to hire someone to replace the owner/operator. Such calculation is based upon the assumptions that you could find an employee who is willing to do everything that the owner/operator does, that such employee would operate the business just as competently as the owner/operator, and that such employee would be willing to work for less than the owner/operator was making. The salary of this hypothetical employee is simply the average amount earned by someone who holds that same position, in this case a restaurant manager. Thus, the "excess earnings" are simply the above-average income earned by the owner/operator.

A spouse's personal attributes are not property, and they therefore cannot be classified as community property or apportioned between spouses upon divorce. *Wolford v. Wolford,* 117 Idaho 61, 785 P.2d 625 (1990). A spouse's knowledge, background, talents, abilities, reputation, work ethic, and so forth are not community property, even if they were enhanced during the marriage. Income earned after the divorce is separate property. Thus, income earned by a spouse after the divorce due to his or her knowledge, background, talents, abilities, reputation, work ethic, or other personal attributes is not community property. It is separate property. Discounting estimated post-divorce income to a present value does not convert it into community property.

"The goodwill of a business is the custom which it attracts, and the benefits or advantages it receives from constant or habitual customers, and the probability that old customers will continue to come to the place." *Harshbarger v. Eby*, 28 Idaho 753, 761, 156 P. 619, 621 (1916). As the majority states, a business' "value" is "what a willing buyer would pay a willing seller for the business." The definition of value presupposes a sale. It is an estimate of the price for which the asset could be sold. As stated in *Harshbarger v. Eby, id.*, "It is well settled that the 'goodwill' of a business, like a trademark, is a species of property subject to sale by the proprietor...." For a business to have any value in "goodwill," that goodwill must be something that can be sold. It must be something for which the buyer is willing to pay money and could acquire upon purchasing the business, such as location or brand name. The purchaser of the business cannot acquire the knowledge, background, talents, abilities, reputation, work ethic, or other personal attributes of the seller. Therefore, for a business to have "goodwill," such value must be based upon the business' ability to attract repeat customers independent of the personal attributes of the seller. The trial court realized this when stating in its findings of fact, "The court recognizes a distinction between 'goodwill' which may be attributable to the business alone (assuming competent but interchangeable management) and goodwill which is specifically related to the reputation and the public's experience with an individual, such as Rex."

Although the majority states, "Goodwill is not the equivalent of future earnings," it supports its finding that the business goodwill has a value of $210,000 by quoting the trial court's statement that the "business does generate cash flow each year, and will likely continue to do so *so long as Rex operates it*." (Emphasis in original.) These two statements are logically inconsistent. The emphasis on the words "so long as Rex operates it" obviously means that the restaurant will continue to generate cash flow only if Rex continues to operate it. Its ability to generate cash flow in the future is based entirely upon Rex's ability to earn income due to his knowledge, background, talents, abilities, reputation, work ethic, and other personal attributes. If, as in this case, goodwill is based entirely upon a spouse's ability to earn money in the future due to the spouse's personal attributes, then goodwill is the equivalent of that spouse's future earnings. It is simply discounting those future earnings to a present value. The trial court did not find, nor did the majority in its decision, that there was anything about Chandler's restaurant, such as location or a loyal customer base, that would cause the restaurant to have repeat customers if Rex were not operating it.

The trial court did not find that an employee could replace Rex if the business were sold. As the trial court found, restaurants in the Ketchum area are primarily owner-operated because they cannot afford to hire someone to manage the restaurant. The trial court's description of what Rex does shows why.

50. Rex works in the restaurant approximately ten (10) or more hours per day and frequently stops in on the days which are scheduled as his "days off." Rex personally manages the overall operation of the restaurant consulting with the chef over food ordering, menus and cost, returning calls for reservations, banking, conceiving and implementing promotion of the restaurant, establishing and maintaining relationships with suppliers, supervising the book-keeping service, constant supervision of the business's performance on items such as food and wine costs, developing the wine list, developing and maintaining an inventory and ordering system of "just in time" ordering so as to have the minimum amount of capital tied up in inventory, directing the timing of the payment of vendors (immediately when cash is available in peak seasons and extended during slack), hiring and supervising employees, supervising the floor during meal service and interacting with customers, making sure that he and the staff make personal contact with the customers and remember names of customers and their food and wine preferences, and maintaining constant vigilance over the business's

cash position. Rex's hours vary with the season, but he can and does commonly work up to sixty (60) hours a week.

The trial court found as a general rule that restaurants in the Ketchum area simply close and liquidate equipment rather than sell as going concerns.

The majority's calculation of business goodwill simply is not accurate when the ability to generate "excess earnings" is based upon the personal characteristics of the owner/operator. Under the majority's method of calculating business goodwill, a well-known artist would have goodwill in his or her business even though the only items that could be sold to a buyer would be an easel and some brushes, paints, and blank canvases.