# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49188

ROSS DAVID LAMM,

   Petitioner-Respondent,

v.

LESLIE DIONNE PRESTON,

   Respondent-Appellant.

Boise, November 2022 Term

Opinion filed: January 9, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge. Laurie A. Fortier, Magistrate Judge.

The decision of the district court is <u>affirmed</u>.

Hardee, Piñol & Kracke, PLLC, Boise, for Appellant. Daniel R. Hardee argued.

Bevis, Thiry & Schindele, PA, Boise, for Respondent. Philip Bevis argued.

---

MOELLER, Justice.

This appeal stems from a complex property division caused by the dissolution of an 18-year marriage. Ross Lamm and Leslie Preston each began separate businesses during their marriage. After Ross[1] filed for divorce from Leslie, they stipulated to a custody and support order for their children, as well as the division of most of their marital estate; however, they could not reach an agreement on the valuations of their respective businesses. Following a bench trial, the magistrate court determined that the couple's 25% interest in one of those businesses, Black Sage Acquisition, LLC, was worth $163,373 based on its fair market value. All remaining value was found to be Ross's personal goodwill.

Leslie first appealed the magistrate court's valuation and division of certain business assets in her divorce proceedings to the district court, which upheld the magistrate court's ruling. She

---

[1] Although we typically use surnames when referencing parties (unless they have the same last name), we have used first names in this opinion to avoid confusion and remain consistent with the terminology used by the lower courts.

1

then appealed to this Court. We affirm the district court's decision to uphold the magistrate court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ross Lamm married Leslie Preston in California on November 4, 2000. They have two children. Each spouse started businesses during their marriage. Ross began PerceptiVU, Inc., a software and consulting business, shortly after marrying Leslie. Later, in 2012, Ross and Leslie moved to Idaho so that Leslie could start her own business, Coiled Wines, LLC. In 2014, Ross started another corporation. He and two other individuals created Black Sage Technology, Inc. ("BST"), a company that created anti-drone technology and long-range video target tracking for airspace protection. At the time BST was incorporated, Ross and David Romero ("Dave") were equal co-owners with 10,000 shares each in the company. The value of Ross' and Leslie's respective business interests became the primary contested issue in these divorce proceedings.

On September 25, 2018, Ross filed a petition for legal separation from Leslie. Following a two-month separation, Ross filed a petition for divorce in November 2018. Around this time, BST began encountering financial difficulties that lasted into the next year. Lacking the resources to meet payroll for May 2019, Ross and Dave decided "a sale of [BST] was necessary to continue the business." They agreed to an acquisition by Acorn Growth Companies, LLC ("Acorn"). At that time, BST had 18 employees and about $24,000 in cash, accounts receivable, and some debt.

As plans for the transaction moved forward in May 2019, Ross texted Leslie to make her aware of the potential business sale and the need for Leslie to sign a spousal acknowledgement form (the "Acknowledgement"). Ross's attorney then reached out to Leslie's attorney "to arrange for her signature on the required [Acknowledgement] in May 2019 so the transaction [between Acorn and BST] could be completed." Ross testified at trial that Acorn knew of his ongoing divorce proceedings and did not want to proceed with the transaction unless Leslie signed the Acknowledgment. Leslie received the Acknowledgement and all other relevant documents to the transaction. With assistance from her divorce counsel and other attorneys retained for this purpose, Leslie reviewed the materials. On June 28, 2019, Leslie signed the Acknowledgment.

The following month, Ross and David sold BST to Acorn. Through a stock purchase agreement, Acorn acquired a 55% ownership interest in BST for a cash payment of $4,207,500. A new entity, Black Sage Acquisition, LLC, ("BSA") was also created. Ross received a 25% interest in BSA. He also received $1,275,569 for 5,000 of his shares in BST (which was 50% of his

interest). Ross deposited the $1,275,569 into an interest bearing certificate of deposit with Idaho Trust Bank. Dave received a 20% interest in BSA. He also received $1,618,342.40 for 6,000 of his shares in BST (which was 60% of his interest). The remaining shares of BST were converted to rollover shares in BSA that equaled their undiluted interests. Additionally, as part of the acquisition of BST, the magistrate court found "Ross and Dave may receive tiered earnout payments for 2019, 2020, and 2021 if the targeted adjusted earnings before interest, taxes, depreciation, and amortization are met by BSA." At trial, it was still unknown if any earnout payments would be received for 2019.

Following its acquisition of BST, BSA employed Ross under a two-year contract providing that any work product or intellectual property created by Ross would be "the sole and exclusive property" of BSA. Ross's employment agreement permitted him to continue ownership and perform some limited work for PerceptiVU. It also contained a three-year noncompetition provision following termination of his employment with BSA, in addition to non-solicitation and nondisparagement covenants. Although the BSA shares allowed Ross to be a voting member, the magistrate court found that, based on the Acknowledgment Leslie signed, she would only be a silent partner if the shares were divided.

As the divorce proceeded, Ross and Leslie stipulated to custody and child support for their two children, as well as the division of much of their community property. However, they disagreed on the division and valuation of their respective businesses: BST, BSA, and Coiled Wines.[2]

The magistrate court held a two-day bench trial focused on these assets. Due to continuances and scheduling conflicts, the trial was split between December 27, 2019, and March 6, 2020. Ross and Leslie ultimately stipulated they would be divorced on January 17, 2020. The magistrate court entered the divorce decree on July 22, 2020, *nunc pro tunc* to January 17, 2020.

At trial, Ross testified that he is one of the only individuals who can make modifications to the source code for the video tracking software transferred to BSA. He holds a Ph.D. in engineering with a specialty in image processing and machine vision. Other statements in the record—and considered in the experts' reports—assert that Ross's expertise is irreplaceable and essential to the business. Dave provided a letter stating that BST "could not continue in its current capacity without [Ross's] knowledge, skills, abilities, and relationships," particularly in video

---

[2] The valuations of BST and Coiled Wines have not been contested on appeal.

target tracking, computer vision, and motion control. Rick Nagel, a managing partner of Acorn, said "[Acorn] would not have made an investment in [BST] without [Ross's] agreement" to remain a chief technology officer, to be employed by BSA, to agree to non-competition and non-solicitation provisions in his employment agreement, and to establish a $5,000,000 "key man" life insurance policy with BST as the principal beneficiary. Similarly, the largest customer of BST stated that his company expected to continue business with BST "solely" because of "Ross Lamm's knowledge, skills, and abilities, not any aspect of Black Sage itself."

Each party also had an expert witness prepare reports and testify about the valuation of BST and the BSA shares. Keith Pinkerton testified as an expert for Ross while Peter Butler testified as an expert for Leslie. Both experts agreed that the interest in the BSA shares should be discounted by 25% because of a lack of control and an additional 20% should be discounted because of a lack of marketability. Additionally, although the experts disagreed about whether Ross's potential earnout payments should be considered part of the marital estate, they agreed that the earnout payments were too speculative to value.

Ross's expert, Pinkerton, used an asset-valuation approach to calculate a fair market value of the BSA shares at $1,147,500 at the time of the acquisition, reflecting a discount for a lack of control and marketability. However, Pinkerton's analysis also concluded that the community ownership interest in BSA was only $163,373. This amount was calculated by using BSA's identifiable assets, omitting speculative intellectual property values, and determining that the BSA shares' value included personal goodwill attributable to Ross that "[did] not represent divisible community property." Pinkerton summarized his conclusions at trial as follows:

> So when you apply that, it takes Dr. Lamm's share, the fair market value of that piece to [$]1,147,500. Now, you have to ask yourself, but what does that represent? And, I believe, it's my understanding, that the appropriate standard, that the fruits of a person's labor, accrue to that person post-divorce; that that's not a divisible asset, and so I've tried to estimate what his pro rata share of those assets are from Schedule 3.2 and onward, and I believe that that amount is [$]163,373.

> And so when you take the [$]163,373 from the fair market value of the interest, that's what the goodwill piece is. That's the total goodwill that we're talking about here, of which, I believe, based on every single thing I've seen in this case and every single person I've talked to, that number is entirely dependent upon his future time, toil and effort, knowledge, skills, abilities and relationship, and so I've concluded that that amount is personal goodwill.

Key to Pinkerton's goodwill analysis were (1) the statements from Acorn, Dave, and a customer that Ross's expertise was essential to BSA's success, (2) the Acknowledgement signed by Leslie,

4

(3) the $5 million key man life insurance policy on Ross, (4) the transfer of Ross's intellectual property to BST, and (5) the restrictive covenants in both the stock purchase agreement and Ross's employment agreement.

Butler, Leslie's expert, testified that he considered Pinkerton's analysis to be speculative and his valuation "materially low." Butler did not provide his own valuation of the BSA shares, even though he agreed that the fair market value was $1,147,500 at the time of acquisition. He concluded that the value of the BSA shares had likely increased "significantly" over time "based on fast-moving developments related to the company and the industry." Thus, with the valuation too difficult to calculate, Butler maintained that the 25% interest should just be divided equally, with each party receiving 12.5% of the BSA shares. He also concluded that there was no personal goodwill included in the transaction because, by definition, personal goodwill is nontransferable and resides with the individual. Thus, none of the "assets identified/captured in the [intellectual property rights assignment] and the [stock purchase agreement] were personal goodwill."

After considering the testimony of both experts regarding BST, the magistrate court concluded that "the proceeds from the acquisition of [BST] are community property" and that there was no personal goodwill in BST's value. It also determined that the fair market value of BST was $1,275,569, the amount received as cash consideration from Acorn to Ross. "This total amount [was] reduced by $154,774.34 to offset the pre-divorce distributions awarded by the [magistrate court] to the parties and the requirement that certain debts be paid by the [magistrate court] at the conclusion of the trial on March 6, 2020." Therefore, the magistrate court ordered $1,119,569 be divided equally between the parties for the remaining community interest in BST. All interest earned on the cash consideration was likewise divided equally between Leslie and Ross.

In reviewing the experts' analyses on the value of the BSA shares, the magistrate court recognized that "the value of BSA may be somewhat speculative and difficult to calculate," but that it had a responsibility do so in light of "the parties' interest in being disentangled from one another after their divorce." The magistrate court explained:

> By allowing Leslie to maintain an interest in BSA, a business which she knows very little about and will be primarily successful by Ross's continued employment, knowledge and skills as well as a business where she would lack the ability to vote with her shares, the parties will continue to be entangled and could not go on with their lives independent of one another. It is not appropriate to value the interest held by Ross in BSA based solely upon Acorn's cost of acquisition of [BST] given that BSA is "essentially still a start-up venture" as noted by Mr. Pinkerton and has only

5

made a small economic profit in 2018. A willing buyer is unlikely to pay the same amount for BSA as Acorn did for [BST] and as such the Court concludes the valuation by Mr. Pinkerton using the solely [sic] the identifiable assets to determine the fair market value of the 25% interest in BSA is appropriate. Any additional value in the share of BSA held by Ross that may exist above its identifiable assets can clearly be traced to Ross's personal attributes and will be found to be his personal goodwill. The Court concludes the fair market value of the community interest in BSA is $163,373.

The magistrate court also found the future tiered earnout payments to be Ross's separate property.

Both Ross and Leslie filed post-judgment motions, which were heard on August 25, 2020. Following the hearing, Leslie filed a notice of appeal. The magistrate court then issued amended findings of fact and conclusions of law, and an amended judgment and decree of divorce. These amendments were largely done to correct and clarify the judgments concerning the property and debt schedule, address a clerical issue on an order of erratum, and add in the cost of tax preparation fees.

Leslie then filed an amended appeal to the district court. She argued that the magistrate court incorrectly valued the BSA shares, erred in finding that future earnout payments were Ross's separate property, and incorrectly determined the value of her business Coiled Wines, LLC. On intermediate appeal, the district court affirmed the magistrate court's valuation of the BSA shares. It concluded that substantial and competent evidence supported the magistrate court's determinations on valuing the BSA shares. The district court explained that the magistrate court had authority and discretion to value the community property, it properly weighed the conflicting evidence from trial, and Pinkerton's goodwill analysis supported the valuation of the BSA shares. Additionally, the district court determined that the magistrate court correctly valued Coiled Wines. However, the district court also concluded that the magistrate court erred in concluding that the earnout payments were Ross's separate property.

Leslie timely appealed to this Court, assigning error to both lower court decisions, but only regarding their rulings on the division of the BSA shares.

## II. STANDARDS OF REVIEW

When this Court reviews the decisions of a district court sitting in its appellate capacity, the Court applies the following standard of review:

The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the

6

district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

*Papin v. Papin*, 166 Idaho 9, 18, 454 P.3d 1092, 1101 (2019) (internal citations omitted) (quoting *Pelayo v. Pelayo*, 154 Idaho 855, 858-59, 303 P.3d 214, 217-18 (2013) and *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)). Thus, while this Court reviews the record to ascertain whether there is factual and legal support for the magistrate court's findings and conclusions, we are "procedurally bound to affirm or reverse the decisions of the district court." *Id.*

Additionally, the "[d]isposition of property—including valuation and division—is a question of discretion, guided by statutory and case law." *Stewart v. Stewart*, 143 Idaho 673, 677, 152 P.3d 544, 548 (2007). In reviewing exercises of discretion, this Court applies a multi-tiered inquiry: "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Because this Court has held "the determination of the value of community property is within the discretion of the trial court," the magistrate court's determination "will not be disturbed on appeal if it is supported by substantial competent evidence." *Chandler v. Chandler*, 136 Idaho 246, 249, 32 P.3d 140, 143 (2001) (internal citations and quotation marks omitted). Where there is conflicting evidence, the trial court " 'determines the weight, credibility and inferences to be drawn' from the evidence." *Id.* (quoting *McAffee v. McAffee*, 132 Idaho 281, 287, 971 P.2d 734, 740 (Ct.App.1999)).

### III. ANALYSIS

**A. The district court did not err in affirming the magistrate court's valuation of the BSA shares and its determination of Ross's personal goodwill in those shares.**

The arguments on appeal center on whether the lower courts properly accounted for and apportioned the value of any personal goodwill in BSA. On reviewing the evidence adduced at trial, as well as the reports of the conflicting expert witnesses, the magistrate court found that the 25% community interest acquired in BSA held a fair market value of $163,373; however, any remaining value was Ross's personal goodwill and, thus, his separate property. This determination was affirmed by the district court.

On appeal, Leslie argues that the lower courts mischaracterized the disposition of the BSA shares by deeming the vast bulk of their value to be Ross's separate property. She contends that

the BSA shares in their entirety are "community property given the nature of the property used to acquire them, i.e., given the community nature of BST." Within this argument, Leslie articulates four specific issues: whether the magistrate court erred in (1) characterizing only a portion of the shares as divisible community property; (2) declining to equally divide the BSA shares between Leslie and Ross; (3) applying a "willing buyer" analysis as well as adopting Pinkerton's goodwill analysis; and (4) finding the community value of the shares to be only $163,373. We will address each issue in turn.

### 1. *The magistrate court did not err in concluding that although the community has an interest in the BSA shares, much of their value is comprised of Ross's personal goodwill.*

Leslie first argues on appeal that the lower courts mischaracterized the disposition of the BSA shares, making the bulk of their value Ross's separate property. Ross responds that the magistrate court correctly characterized all of the BST sale proceeds—including the BSA shares—as community property, but that it was "necessary to value BSA with consideration of goodwill." The magistrate court concluded that the community property value of the shares was $163,373. It then determined that "[a]ny additional value in the share of BSA held by Ross that may exist above its identifiable assets can clearly be traced to Ross's personal attributes and will be found to be his personal goodwill." We agree with the magistrate court's analysis and affirm the district court's conclusion that it is supported by substantial and competent evidence.

"Two values must be considered when determining the overall value of a business: intangible assets and tangible assets." *Chandler*, 136 Idaho at 249, 32 P.3d at 143. "Goodwill" is an intangible asset and "is an appropriate factor in determining the value of a business." *Id.* We have explained that business goodwill

> represents the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence.

*Id.* at 249–50, 32 P.3d at 143–44 (citations and internal quotation marks omitted). Determining goodwill "is the most complex aspect" of business valuation and we have recognized that there are "many accepted methods" used by experts to value goodwill. *Id.* at 250, 32 P.3d at 144. "The goal of utilizing these various methods is to enable the trial court to accurately approximate a business's true 'value,' that is, what a willing buyer would pay a willing seller for the business."

8

*Id.* "How the trial court assesses and weighs each method and variable with it, in each particular case, is within that court's discretion." *Id.*

In contrast to business goodwill, "personal goodwill" is defined as "[g]oodwill attributable to an individual's skills, knowledge, efforts, training, or reputation in making a business successful." *Goodwill*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also Stewart v. Stewart*, 143 Idaho 673, 681–83, 152 P.3d 544, 552–54 (2007) (Eismann, J., dissenting in part and concurring in part). "A significant majority of American jurisdictions hold that the personal goodwill of a business cannot be classified as marital property" because it is the "individual, nontransferable reputation of a specific owner." *Personal Goodwill*, 22 No. 12 Equitable Distribution J. 133 (Brett R. Turner ed., 2005). Idaho law likewise "treats personal skill and reputation as separate assets rather than community property." *Stewart*, 143 Idaho at 677, 152 P.3d at 548 (citing *Olsen v. Olsen*, 125 Idaho 603, 873 P.2d 857 (1994); *Wolford v. Wolford*, 117 Idaho 61, 785 P.2d 625 (1990)). While this Court has not, until now, employed the specific terminology of personal goodwill versus business goodwill in our holdings, we have consistently held that an individual's knowledge, background, and talent are personal assets rather than community property. *Olsen*, 125 Idaho at 606, 873 P.2d at 860. A similar result was reached in *Wolford*, where this Court determined that a person's "knowledge, background and talents" cannot be categorized as property subject to division. 117 Idaho at 67, 785 P.2d at 631 (1990). Thus, these cases instruct us that business goodwill is community property while personal goodwill is not. *Stewart*, 143 Idaho at 677–78, 152 P.3d at 548–49.

Here, the magistrate court determined that all proceeds from the BST acquisition were community property of the marital estate as both the business's creation and the transaction at issue occurred during the marriage of Ross and Leslie. Pursuant to Idaho case law, "[t]he character of property vests at the time the property is acquired." *Kraly v. Kraly*, 147 Idaho 299, 303, 208 P.3d 281, 285 (2009). The issue before this Court turns on whether substantial and competent evidence supports the magistrate court's conclusion that the community interest in the BSA shares has a value of $163,373, while the remaining value is solely attributed to Ross's personal goodwill.

Both experts who testified at trial expressed concerns over the speculation inherent in attempting to place a value on the intangible assets of the BSA shares. This led to Butler (Leslie's expert) making no attempt to value the BSA shares while Pinkerton (Ross's expert) concluded that much of the shares' value beyond its identifiable assets consisted of Ross's personal goodwill.

9

Ultimately, the magistrate court did not determine that the BSA shares were separate property per se. Rather, on reviewing the expert evidence, it concluded that the identifiable assets in the BSA shares held a fair market value of $163,373. This portion was deemed to be a community asset and was divided equally between the parties. The magistrate court then concluded that "*[a]ny additional value* in the [25%] share of BSA . . . that may exist above its identifiable assets can clearly be traced to Ross's personal attributes." Thus, the magistrate court concluded, if there was remaining value in the shares, it was Ross's personal goodwill.

The magistrate court calculated the community interest in the BSA shares using an "identifiable assets approach," which established a community value of $163,373. This valuation method, used by Pinkerton, considered the identifiable assets without taking into account speculative and unidentifiable intellectual property values, while also considering ample evidence in the record that showed that at the time of the sale, BSA's value was determined in large part by Ross's personal goodwill. For example, statements from Dave, Acorn, and BST customers repeatedly emphasized that Ross's expertise in video target tracking, computer vision, and motion control were irreplaceable to the company and helped establish the company's main customer base. Additionally, Ross's employment agreement, restrictive covenants, and $5 million key man life insurance policy—with BST as the sole beneficiary—highlighted the unique, personal value Acorn and BSA placed in Ross acting as its chief technology officer. In short, the record supports the statements from Acorn that it would not have sought to acquire BST without Ross's ongoing involvement in the company.

Leslie contends that Pinkerton's analysis was speculative and lacked foundation. The magistrate court considered this argument in light of the evidence presented at trial, including the reports from both expert witnesses. Pinkerton's analysis considered asset, market, and income approaches in valuing the BSA shares and ultimately used the identifiable asset approach as the best means to "accurately approximate" the shares' fair market value. As summarized by the magistrate court:

> Both Keith Pinkerton and Peter Butler opined on the value of BSA and the community share of the cash consideration received for the acquisition for Ross and Dave's 55% interest in [BST]. Mr. Pinkerton considered asset, market and income approaches to value BSA and ultimately concluded the fair market value of Ross's 25% interest in BSA is $163,373 using BSA's identifiable assets. The balance sheets used by Mr. Pinkerton did not include the software or intellectual property transferred to BSA in his calculations as it is an intangible asset for which

10

a value cannot be placed upon it without pure speculation, however, he included a number of other identified intangible assets as shown on Schedule 4.2. The experts agreed Ross's interest in BSA should be discounted for lack of control by 25% and lack of marketability by 20%, for a cumulative discount of 40%, given Ross's 25% equity interest in BSA, which would result in a fair market value of $1,147,500 at the time of the acquisition. Mr. Pinkerton further concluded the value of the community portion of the [BST] acquisition cash consideration is $275,200 by using the Ross's share of the identifiable assets as shown in Schedule 3.1, with the remaining amount being the personal goodwill of Ross and therefore should be found to be his separate property.

(Internal citations omitted.) In contrast, Butler's analysis did not determine a value for the BSA shares, but simply recommended an equal division of the 25% interest in BSA.

Undoubtedly, there will always be some speculation inherent in such calculations, as both experts and the magistrate court acknowledged in assigning a market value of the shares. Much of that uncertainty may be attributed to the unknown value of the BSA shares going forward. Likewise, much of the speculation is due to the intangible nature of BSA's assets, primarily the intellectual property involved in the business's anti-drone technology, such as Ross's expertise in coding and software development. This left the magistrate court with two potential courses when weighing the evidence: Pinkerton's identifiable asset approach with consideration of personal goodwill or Butler's conclusion to split the 25% minority interest in BSA evenly between the parties. Pinkerton's analysis provided a fair market value of the community interest while also considering whether Ross's personal goodwill was involved in the acquisitions of BST, which findings were supported by substantial and competent evidence in the record. Furthermore, the magistrate court determined that Butler's proposal of equal division of the shares—giving Ross and Leslie each 12.5% interest in BSA—would result in Leslie having an equivalent interest in a business and technology for which she had little knowledge and no experience. Additionally, as will be discussed more fully below, it would essentially leave Ross and Leslie as business partners, which the court concluded would not sufficiently "disentangle" the divorcing parties.

Altogether, the record reflects that the magistrate court carefully considered all the evidence and the two experts' differing methodologies for determining the value of the shares. Important to its conclusion was the disentanglement of the divorcing parties, valuations based on an identifiable assets approach, and the recognition of Ross's personal goodwill. Because we agree with the district court that the magistrate court correctly characterized the community nature of the shares and made a reasoned decision to apply Pinkerton's methodology and goodwill analysis, we

11

affirm the district court's decision to uphold the magistrate court's ruling. Substantial and competent evidence supported the magistrate court's factual findings and the conclusions of law properly flowed from those findings.

### 2. *The magistrate court did not err in declining to divide the BSA shares because a simple division of shares would not have disentangled Ross and Leslie.*

Leslie next contends that the magistrate court "erred in finding that it had a 'duty' to disentangle Ross and Leslie in the matter, as no possible entanglement existed." She argues that as a silent partner with a minority interest in BSA, there would be no entanglements. Ross responds that "he has a critical role in BSA and should not be subject to disputes/potential disputes with an ex-spouse related to BSA." After reviewing the record, we conclude that the magistrate court properly determined that simply dividing the business shares in BSA would not sufficiently disentangle the parties.

The division of property "is a routine and challenging part of most divorce cases." *Papin*, 166 Idaho at 34, 454 P.3d at 1117. As this Court reiterated in *Papin*:

> Idaho courts have a duty not only to dissolve the parties' marital status, but also to make an equitable distribution of the parties' community property in order to *disentangle the parties' legal affairs*. Idaho courts must undo the bonds of the divorcing parties' community property relationships in order to permit the divorcees to go on with their lives independent of one another. Parties to a divorce "have a right to have their respective interests in their property after they are divorced, definitely and finally determined in the decree which divorces them," so that the prospect of future litigation is less likely.

*Id.* (quoting *Chavez v. Barrus*, 146 Idaho 212, 220, 192 P.3d 1036, 1044 (2008)) (emphasis added).

However, in the case of shares in a business, disentanglement may require more than a simple division of stock. For example, in *Josephson*, the Idaho Court of Appeals considered an appeal where the wife challenged the trial court's decision to evenly split the stock rather than grant her a lump-sum monetary award for the stock's value. *Josephson v. Josephson*, 115 Idaho 1142, 1149, 772 P.2d 1236, 1243 (Ct. App. 1989), *abrogated on other grounds by Bell v. Bell*, 122 Idaho 520, 835 P.2d 1331 (Ct. App. 1992). The Court of Appeals agreed that a substantially equal division of stock may be appropriate where the community shares are publicly traded; however, where "the community owns stock in a closely held corporation, with majority control in one spouse and with virtually no public market for the stock, the simple division of the stock does little to completely separate the parties and their property." *Id.* In *Josephson*, the husband spent a lifetime building up his business, and the wife would only have a minority interest without

12

dividends or control opportunities. Her stock was essentially "valueless until the corporation is dissolved and its assets liquidated." *Id.* at 1149–50, 772 P.2d 1236, 1243–44. Consequently, the Court of Appeals concluded that the magistrate court had not adequately considered the needs of each spouse and the conditions of the parties. The court vacated the magistrate court's decision to merely divide the stock and remanded for a determination of the shares' market value at the time of the divorce. *Id.* at 1150, 772 P.2d 1236, 1244.

Although the case at bar does not involve a majority interest controlled by one spouse, there are important similarities to *Josephson*. BSA is a small, closely-held limited liability company that was created through the stock purchase agreement between BST and Acorn. It arose from the business Ross built up through his expertise in anti-drone technology. Awarding Leslie a 12.5% interest, with limited control and marketability, does not necessarily offer her a simple monetary value or investment in the business's success; rather, it entangles the parties by leaving both Leslie and Ross with equal interests in a small, closely-held business for which only Ross was working. Even if Leslie were to remain a silent partner, she would still be entangled in Ross's business affairs. As articulated in Ross's briefing, co-ownership by divorced parties could lead to additional litigation and disputes over a variety of issues, such as fiduciary duties, Leslie's rights as a minority shareholder to participate in meetings or make financial inquiries, ownership changes going forward, the rights of either Ross or Leslie to sell their shares, and so on. The magistrate court carefully weighed these considerations in its final determination and concluded:

> by allowing Leslie to maintain an interest in BSA, a business which she knows very little about and will be primarily successful by Ross's continued employment, knowledge and skills as well as a business where she would lack the ability to vote with her shares, the parties will continue to be entangled and could not go on with their lives independent of one another.

This conclusion is in line with *Josephson*, where the Court of Appeals likewise concluded that "the simple division of the stock does little to completely separate the parties and their property." 115 Idaho at 1149, 772 P.2d at 1243. Therefore, we find no error with the district court's decision to affirm the magistrate court's judgment that the BSA shares between Ross and Leslie should not be divided.

### 3. *The magistrate court did not err in applying a "willing buyer" analysis or in adopting Pinkerton's goodwill analysis.*

Leslie next argues that the magistrate court erred in using Pinkerton's "speculative" goodwill analysis and that the district court erred in upholding that decision on intermediate appeal.

Additionally, she contends that the magistrate court "abused its discretion because it rejected Mr. Butler's analysis and relied on Mr. Pinkerton's speculative analysis about willing buyers." In reviewing the start-up nature of BSA, the magistrate court made the following finding:

> It is not appropriate to value the interest held by Ross in BSA based solely upon Acorn's cost of acquisition of [BST] given that BSA is "essentially still a start—up venture" as noted by Mr. Pinkerton and has only made a small economic profit in 2018. A willing buyer is unlikely to pay the same amount for BSA as Acorn did for [BST] and as such the Court concludes the valuation by Mr. Pinkerton using the solely the identifiable assets to determine the fair market value of the 25% interest in BSA is appropriate.

We conclude, as did the district court, that these findings by the magistrate court were supported by substantial and competent evidence and its legal analysis was correct.

As noted above, we have recognized goodwill as an appropriate factor in determining the value of a business. *Chandler*, 136 Idaho at 250, 32 P.3d at 144. Likewise, we have recognized "many accepted methods" that experts use to estimate a business's value. *Id.* "The goal of utilizing these various methods is to enable the trial court to accurately approximate a business's true 'value,' that is, *what a willing buyer would pay a willing seller for the business*." *Id.* (Emphasis added).

Here, the magistrate court's analysis considered what a willing buyer would pay for the BSA shares because that is the very goal of business valuations, particularly in trying to establish a fair market value. *Chandler*, 136 Idaho at 250, 32 P.3d at 144; *Stewart*, 143 Idaho at 683, 152 P.3d at 554 (2007) (Eismann, J., concurring in part and dissenting in part). When considering the start-up nature of BSA, the prior financial difficulties of BST, and the restrictive employment agreement between Ross and BSA, the magistrate court concluded that a willing buyer would not pay as much for the BSA shares as Acorn did in the acquisition of BST. We agree with the lower courts that relying solely on the cash consideration price of the BSA shares at the time of the acquisition would not fully account for what a willing buyer would pay at the time of Ross's and Leslie's divorce.

The consideration of personal goodwill was equally appropriate here in attempting to separate any intangible value in the BSA shares based on Ross's talents, knowledge, and expertise. While business goodwill is an appropriate factor in valuing a business, this Court has determined that personal goodwill is not community property. Accordingly, it is not subject to division in divorce proceedings. *Stewart*, 143 Idaho at 677, 152 P.3d at 548; *Olsen*, 125 Idaho at 606, 873

14

P.2d at 860; *Wolford*, 117 Idaho at 67, 785 P.2d at 631. After all, "[a] willing buyer cannot purchase . . . personal attributes. A willing buyer cannot purchase the relationship [an individual] has with his [clients] or their confidence in him." *Stewart*, 143 Idaho at 683, 152 P.3d at 554 (2007) (Eismann, J., concurring and dissenting in part).

The record supports the magistrate court's finding that much of BSA's value consists of intangible assets, such as intellectual property and Ross's personal goodwill in his role as the business's chief technology officer. It was appropriate and essential for the magistrate court's analysis to consider these factors in determining the value of BSA; thus, we agree with the district court's affirmance on these grounds. There was no abuse of discretion by the magistrate court in applying the personal goodwill and willing buyer analyses.

### 4. The magistrate court did not err in concluding that the community property value of the shares was $163,373.

Alternatively, Leslie contends that this Court "should find that Mr. Pinkerton's analysis was not credible and should order the [lower court] to divide the full transactional value of the BSA shares." She points to the $1,912,500 cash consideration amount for Ross's shares in BST as the most appropriate value for the BSA shares. However, as explained by Pinkerton at trial, $1,912,500 was the "raw number" value of Ross's 25% interest in BSA. This amount preceded discounts for lack of control and marketability—discounts that *both* experts agreed should apply in valuing the BSA shares. After applying those discounts, Pinkerton's analysis calculated that the minority, non-marketable, 25% dilutable interest in BSA was $1,147,500. Butler agreed with this number insofar that it was the value of BSA at the date of the transaction.

Notably, the course of action Leslie now recommends on appeal is not a solution contemplated by either of the expert witnesses, nor the magistrate court in its analysis. Additionally, Leslie does not provide an explanation of how only she could receive a lump-sum monetary award or whether Ross would be able keep his 12.5% interest after division. While $1,147,500 is the clear valuation of BSA at the time Acorn acquired BST, it is not the clear valuation at the time of Ross and Leslie's divorce. Based on Pinkerton's analysis, that amount likely included substantial intangible assets in the form of Ross's personal goodwill since Acorn was only willing to acquire BST if Ross remained the "key man" and chief technology officer of BSA. Thus, we do not agree with Leslie that the magistrate court erred in its valuations.

Accordingly, we affirm the application of Pinkerton's asset-value approach and goodwill analysis as used by the magistrate and district courts. This method of valuation calculated the

community property interest in BSA at $163,373 as of the time of the divorce, which we have concluded was supported by substantial and competent evidence.

**B. Neither party is entitled to attorney fees on appeal.**

Both parties request attorney fees on appeal under Idaho Code section 12-121, which permits a court to "award reasonable attorney's fees to the prevailing party or parties when . . . the case was brought, pursued or defended frivolously, unreasonably or without foundation."

Although Ross is the prevailing party on appeal, the issues Leslie presented on appeal resulted from a uniquely complex valuation and division of the community property. Additionally, this case required us to engage in a first-impression analysis of the interplay between business goodwill and personal goodwill. Therefore, we conclude that the claims Leslie presented on appeal were neither frivolous, unreasonable, nor unfounded. Accordingly, we will not award attorney fees to either party.

## IV. Conclusion

The district court's order upholding the magistrate court's valuation and division of the BSA shares is affirmed. Pursuant to Idaho Appellate Rule 40(a), we award costs as matter of course to Ross on appeal.

Chief Justice BEVAN, Justices BRODY, STEGNER and Justice Pro Tem MELANSON **CONCUR.**